## City of Henderson v. The George Delker Company.

## Same v. Delker Brothers Buggy Company.

(Decided December 16, 1921.)

### Appeals from Henderson Circuit Court.

1.   Manufactures—What Determines Whether Article Manufactured.
     —It is not the means or methods employed nor the nature or num-

ber of processes resorted to or the size of the factory or the number of hands it employs or the volume of machinery in use, but the result accomplished that determines whether the article is manufactured or not.

2. Manufactures—Meaning of Words "Manufacturer" and "Manufacturing Establishment."—The meaning of the words "manufacture" and "manufacturing establishment" has been adapted to meet the varying circumstances arising in the case or class of cases in which it was necessary to define them, so that the intent with which they were used might be accomplished. The purpose of the lawmaking body in using the words has always been allowed to have controlling weight in the decision of the meaning that should be attached to them.

3. Municipal Corporations—Exemptions.—Laws granting tax exemptions to manufacturing companies, because in derogation of common right, are not so favorably regarded by the courts as to justify an interpretation that would extend their meaning by mere implication. In other words, tax exemptions, like other cases of special privileges, are to be strictly construed.

4. Manufactures—Raw Material.—"Raw material" from which an article is manufactured need not be crude material and if the material used in producing the article, claimed to be manufactured by mechanical processes, is changed and altered so as to form a distinct finished and completed product, adapted for the use for which it was intended in its then condition, it will be treated as "raw material," although it required mechanical processes to produce it from the crude material.

5. Municipal Corporations—Exemption from Taxation.—From the facts appearing in the opinion (which are copied from the agreed stipulation upon which the court based the judgments appealed from) it is held that defendants were "engaged in manufacturing" at their plants in Henderson, Kentucky, and that the city is not authorized to assess and collect taxes on their machinery and products in course of manufacture or their raw material actually on hand for the purpose of manufacture; but the lumber used only for crating purposes in preparing the manufactured article for shipment is not exempt under the statute, since it is not "on hand for the purpose of manufacturing."

B. S. MORRIS for appellant.

HENSON & TAYLOR for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming on both the original and cross appeals.

The plaintiff and appellant, city of Henderson, brought these two actions against the two defendant corporations, the appellees, The George Delker Company and Delker Brothers Buggy Company, seeking to recover

judgments against them for municipal taxes claimed to be due it from defendants upon certain property owned by them which they each operated and used in the prosecution of their business enterprise, located within the limits of the city. The right to the recovery was resisted upon the ground that the property sought to be taxed was "Machinery and products in course of manufacture of persons, firms or corporations actually engaged in manufacturing and their raw material actually on hand at their plants for the purpose of manufacture," which is expressly exempted from local taxation by exemption (2), of section 4019a-10, volume 3, Kentucky Statutes, which was enacted at the 1917 special session of the legislature. Each defendant is engaged in precisely the same business, and each case was submitted and tried on an agreed stipulation of facts, the one being substantially, if not an exact copy of the other. Defendants are each wholesale and retail dealers in buggies, carriages and other horse drawn vehicles, which they claim are manufactured by them at their respective plants in the city of Henderson, while plaintiff insists that neither defendant manufactures any of the vehicles in which it deals, but that they assemble them by putting together the already manufactured parts which are purchased by them from others who manufacture them. It therefore becomes essential to look to the facts from which a decision of the question must be made.

Each of the defendants operates a large factory within the corporate limits of the city; the defendant, The George Delker Company, employing ninety (90) persons whose combined salary for the year ending June 30, 1918, was $75,606.00, and the defendant, Delker Brothers Buggy Company, during the same time employed "more than one hundred and seventy-five (175) persons" whose combined salary was $132,149.17. The acts performed, and the work done, as well as the machinery and methods employed therein, are so clearly stated in the stipulations that we have concluded, in furtherance of a better understanding, though at the expense of space, to insert herein the following excerpt from the one in the action against defendant, The George Delker Company:

"It (defendant) purchases in large quantities in the already manufactured state, leather, enameled goods, cloth lining and excelsior used in cushioning and upholstering the seats, backs, sides and tops of buggies. This material is then cut by defendant and fashioned in the

proper shape and fastened and put together and used by defendant in making up these parts.

"The springs used in the seats, tacks, thread, knobs, fastenings, and other similar accessories and finishing material are bought in large quantities already manufactured, and are used by defendant's employes in making up, fitting and finishing the cushions, backs, tops, seats, and other parts of buggies. The joints, railings, bow sockets, and wood bows that go into the top are bought in large quantities already made and are used by defendant's employes in putting together, shaping, forming, riveting, and joining the parts of the tops.

"The axles that are used by the defendant for the buggies are purchased in halves made to the proper size and with threads already cut on the ends of said axles and taps therefor. The said axles are then at the defendant's place of business and by machinery and appliances thereto welded together, and wood caps are fitted thereon and glued, the said wood caps being already made and purchased in large quantities by the defendant and are then clipped to the axles and dressed down to a smooth finish with the axle, the said clips and taps therefor being purchased by the defendant already made. The reaches are fitted to iron strips to reinforce them and they are bolted together; the said reaches and iron strips are bored and punched by the defendant, and bolts so used are made when purchased by the defendant. To these are fitted the different irons and fifth wheel, which irons and fifth wheel are purchased by the defendant in the finished state, and these in turn are attached to the axle.

"The buggy springs are bought from factories that make a specialty of making such springs and are clipped on and fastened to the axles, the fifth wheel and reaches. And hangers, bar, etc., are also purchased by the defendant after they have been made, and are fitted to the springs or reaches and are bolted or clipped on and are dressed down to a smooth finish, the bolts and clips therefor being purchased by the defendant in quantities already made. The shaft arms, cross bars and single trees to which the tugs are fastened are purchased from a factory making a specialty of such parts and already made and shaped. When they arrive at the defendant's place of business the holes through the shafts are already made for receiving the ends of the cross bars and the ends of said cross bars are already dressed down and shaped

ready to be tenoned together. At defendant's place of business the employes tenon these parts together and irons which are already manufactured when the defendant purchases them are fitted to said parts, shafts are drilled by the defendant, and bolted on. The shaft straps and leathers are cut and shaped by the defendant and fitted and fastened to the shafts.

"The wheels are bought in large quantities in the white and from companies making a specialtyof their manufacture, the hubs and spokes and felloes, or rims, being made and put together and shaped and fitted before they are received at the defendant's place of business and ready for receiving the tires. The defendant at its place of business bores out the hub through which a small hole has already been bored and fits the metal box in the hub, but the said box is purchased by the defendant in its finished state and is fitted in said hub by driving it through the hole thus bored out by the defendant. The tires for the wheels are purchased by the defendant in large quantities. They come in straight bars and the defendant cuts them to length, bends it to form a tire for the wheel, welds the tire and shrinks it on the wheel and then drills the rim, bolts the tire to the wheel, but the bolts and taps used in fitting the tire to the wheels are manufactured and made when purchased by the defendant.

"The machinery at defendant's place of business as aforesaid is all used in cutting, drilling, shaping, forming, fitting, fastening, and adjusting the parts of the buggies as above set out, and is the machinery assessed by the plaintiff, City of Henderson, as hereinbefore stated.

"In another department of defendant's place of business is done the painting of the buggies and other vehicles made by the defendant. The different parts of the buggy that are required to be painted are sanded down to a smooth finish and to these parts are applied from four to twelve coats of paint, depending upon the use to which the part is subjected and the service thereof. Between the application of these different coats of paint, defendant's employes are engaged in sanding and smoothing the work to get the desired finish. In this department the paints, oils and varnishes are carefully and skillfully mixed so as to produce the best possible result. The paints, oils and varnishes used by the defendant company are made by and bought from factories making a specialty thereof. The buggies are then inspected and packed and shipped in large quantities to regular dealers

in various states and in small quantities to many other states, and less than two per cent are sold by retail from the said defendant's place of business in the city of Henderson."

The same agreement was made, as we have stated, in the other case and the question is sharply presented whether the business therein described constitutes "manufacturing" within the contemplation of the statute creating the exemption so as to relieve defendants' machinery and material and products so employed and actually on hand at their plants, from municipal taxation. The trial court in each case, upon the agreed facts, found that the property came within the purview of the statute and declined to render judgment for the taxes claimed, but refused to exempt the rough lumber on hand and used exclusively for crating the vehicles after they were finished for purposes of shipment, and from the judgments so pronounced the city has appealed and defendants have moved for and obtained a cross appeal from the alleged error of the court in not exempting the lumber on hand used only for crating.

The same exemption claim was before us in the recent case of City of Lexington v. Lexington Leader Co., 193 Ky. 107 (decided December 2, 1921), in which the only finished article claimed to be produced by appellee therein was a printed newspaper; and upon thorough examination of cases and authorities, and applying the settled principles of law governing in the determination of the question involved, the conclusion was reached that a newspaper is not a manufactured article within the meaning, purpose and contemplation of the exemption statute now under consideration. It was therein said that courts, generally, when dealing with statutes wherein the terms "manufacture," "manufacturing," "manufacturing establishment" and "engaged in manufacturing" are employed do not adopt or apply their lexicographical definitions, and that, "they are extremely difficult, if not impossible, of exact legal definition." It was further held in that case that in construing those terms, "courts are largely governed by the circumstances surrounding the cases in which they are used, and by the intent and purpose of the legislature in enacting the particular statute in which they are found; which results in construing the words as meaning one thing in a particular statute and entirely a different thing in another one, dependent, as indicated, upon the intention and purpose in enacting

the statute and the end intended to be accomplished thereby.'' The meaning of the expressions, as therein shown, is to be measured by ''the common understanding of mankind'' of the idea intended to be conveyed by their use in the particular connection in which they are employed. Furthermore, as will be seen from that case, the terms are to be more strictly construed in tax exemption statutes, which extend privileges not enjoyed by all members of the public, than in others promulgating a legislative public policy; an illustration of which is the now prevailing Mechanics' Lien Statute found in all or most of the states.

With these general principles before us, and with the assistance of adjudicated cases, we will now proceed to determine the questions involved in the two appeals. Besides the Lexington Leader Company case, *supra,* this court has heretofore had before it tax exemption statutes of manufacturing establishments or of the machinery, products and material of those ''engaged in manufacturing'' in the cases of Standard Tailoring Co. v. City of Louisville, 152 Ky. 504; City of Louisville v. Louisville Tin & Stove Co., 170 Ky. 577; American Tobacco Co. v. City of Bowling Green, 181 Ky. 416; P. Lorrillard Co. v. Ross, 183 Ky. 217, and City of Louisville v. Zinmeister & Sons, 188 Ky. 570. The Standard Tailoring Co case is also reported in 44 L. R. A. (N. S.) 303, and Ann Cas. 1915B 320, and the Zinmeister case is reported in 10 A. L. R. 1269, and beginning on page 1273 of that volume is an extended annotation upon the question ''Who is a Manufacturer within the meaning of the Tax Exemption Provisions?'' and practically all of the cases in the country dealing with the question as applicable to the various processes claimed to constitute ''manufacturing'' and as applicable to variously enumerated manufactured articles, are referred to therein.

The Lorrillard, Zinmeister and American Tobacco Company cases involved exemptions claimed under the same statute here invoked by defendants, while in the other Kentucky cases cited a similar question was involved, but which grew out of five year exemption ordinances to new factories and manufacturing institutions locating within the municipality. But in each class of cases the legal question was, for all practical purposes, the same. In the Lorrillard and the American Tobacco Company cases the taxpayer was engaged in buying tobacco in the hand and stemming the leaves, which were

afterward tied into bundles, and, after certain processes of drying and curing, the tobacco was put in proper packages for shipment to factories located elsewhere, and where it would be manufactured into various tobacco products for consumption and use; and it was held in each of them that the processes applied to the raw material were not sufficient to constitute manufacturing, or that the stemmed tobacco was a manufactured article within the meaning of our present statute, and the exemption was denied, and in the Lorrillard case it was said that "It is not the means or methods employed or the number or nature of the processes resorted to, but the result accomplished that determines whether the article is manufactured or not."

In the Louisville Tin & Stove Company case the company, which was located in Louisville, was operating a tin shop and employed only about twenty men. In stating the character of work from which the determination of the question as to whether defendant was conducting a manufacturing establishment, the opinion says: "While not occupied with repair work they were engaged in what the officers called 'assembling' coffee pots, buckets, water coolers, sprinklers, stove pipes, drum stoves and ash pans. The tops, ears and bails of the buckets were bought, as were the spouts, handles and tops of the coffee pots, and legs, doors, etc., of the drum stoves. The bodies of the tinware were made from sheet tin, which was cut and shaped by the tinners to fit the purchased parts, and the whole was soldered together so as to make the completed articles. The steel out of which the stove pipe, ash pans and stoves were made came in flat sheets, which were cut and shaped by hand, and from the sheet steel in its crude condition were evolved the completed articles." From these facts it was held that the company was engaged in manufacturing the completed articles mentioned from the already manufactured parts which it purchased elsewhere, and in doing so the court said: "We do not understand that in order for a business enterprise to be a manufactory it is necessary for it to be engaged in the business of making completed articles from materials that are altogether raw. It is none the less a manufactory if, as in this case, it combines separate parts manufactured and completed by others with raw material which it itself cuts and fashions into proper shape, and thus produces an entirely new article suitable for use.

Thus it will be seen that, although it may be true that defendant's chief business prior to 1906 consisted in selling articles manufactured by others, yet it had in its tin shop about twenty men who were employed for a considerable portion of their time in manufacturing complete coffee pots, buckets, water coolers, sprinklers, stove pipe, drum stoves and ash pans . . . . As a matter of fact, it was a manufacturer and its new plant was but an expansion of the manufacturing business which it had theretofore conducted.''

In the Zinmeister case, the company imported green coffee and prepared it for use by the consumers by subjecting it to many different processes, the most of which were performed by machinery. The green coffee beans were run through a machine and the perfect ones were separated from the imperfect. The coffee was then thoroughly cleaned and washed; it then passed through a milling machine further cleansing it of all impurities, and then conveyed to a roasting machine from which it left the cylinders at a very high temperature, which had to be kept even to prevent scorching and burning and to make all of the grains uniformly roasted, and after the coffee was again cleansed and polished it passed through another machine which cut the berries into small particles of uniform size for domestic use. It was then packed in specially prepared containers, properly sealed to prevent its losing its strength and aroma. We held that the company was entitled to the exemptions provided in the statute and in so doing said: ''Whether a refining process applied to a given article is 'manufacture' within the meaning of the statutes, section 4019a-10, depends upon the particular facts of the case. Courts have experienced much difficulty in determining what is a manufacturing establishment and what is included in the term 'manufacture.' There is no hard and fast rule by which to determine whether a given establishment is a 'manufactory,' but all the facts and circumstances must be taken into consideration in determining whether the establishment is or is not to be so reckoned. Whether it is such an establishment does not depend upon the size of the plant, the number of men employed, the nature of the business or the articles to be manufactured, but upon all these together and upon the result accomplished.''

If defendants in the two instant cases were engaged in only a technical assembling of the vehicles turned out by them from already finished and manufactured parts which readily fitted each other so that the only work required was to properly attach the parts and thus construct the completed vehicle ready for the use for which it was constructed, we could not be inclined to characterize them as manufacturers or their investment as "engaged in manufacturing," nor the machinery and products used by them as employed "in course of manufacturing," or on hand "for the purpose of manufacturing" within the contemplation of the statute. But, under the agreed facts, we think there can be no doubt that they are engaged in something requiring more mechanical processes and efforts than the mere act of assembling already finished and completed parts of the vehicles which they produce. The parts of the stoves and the tin vessels constructed by the company in the Louisville Tin & Stove Company case were as much or more finished and completed as ·are the separate manufactured parts of the vehicles which defendants use in their business and from which they construct the finished product. As shown in that case, it is not necessary for a business enterprise to be a manufactory that it should make completed articles from materials that are altogether raw, and we may add, as intimated in that opinion, that by the term "raw material," as used in the statute, is not necessarily meant *crude material* in its natural state, but there may be included in the term a product made from the crude material and which has undergone manufacturing processes and converted into a distinct product from which an entirely different one may be made by the application of additional scientific processes, in which case the converted or prepared product may be regarded as "raw material" within the meaning of the statute.

Under the agreed facts in these cases, nearly every part of the vehicle, if not all of them, are more or less unfinished when purchased by defendants, and if put together in that condition there would be formed only a mere skeleton of a vehicle wholly unfit for the market or for the uses intended to be served by the finished one. The tops when purchased by defendant have nothing but exposed bows which must be covered with leather and the insides lined with the proper cloth, all of which must be cut and fitted so as to make a finished job; the back and

sides of the seats are to be cushioned, the tires are made and fitted to the wheels, the two parts of the axles are fitted and fastened together and made to conform the one with the other, and the shafts as purchased are in separate pieces, which do not necessarily fit and they have to be skillfully constructed and shaped. Many other things shown in the agreed statement must be done at defendants' factories before the vehicle is constructed and ready to receive the paint, and after that the paint is applied, which requires science and skill, and at the end of all the evolution processes the finished article appears. In the light of the authorities, *supra,* we think it was the intention and purpose of the legislature, in enacting the exemption statute under consideration, to include within its purview the character of business here involved, and that defendants are each "engaged in manufacturing" and the court properly held their machinery and products so employed as exempt from municipal taxation.

In disposing of the question raised by the cross appeals but little need be said. We do not understand that even the manufactured article itself after completion comes within the exception. In order to be marketed it must be shipped, and if the act of shipping is a part of the process of manufacture the exemption would apply to the manufactured article, which is not true. The crating lumber, which the court by its judgment taxed, does not enter into any of the manufacturing processes; it is needed only after the manufacturing is completed and is only an aid in the process of marketing. It would require a strained construction of the statute to hold that the lumber used only for the purposes stated was material "on hand . . . for the purpose of manufacturing." The crating is no more essential to the shipment of the vehicles than is the wagon or truck upon which they are hauled to the depot or the horses, if any, used for that purpose, or the desks and stationery upon which are made out the accounts and perhaps bills of lading, all of which constitute a part of the act of shipping, and we are convinced that the court was correct in excluding the crating lumber from the exemption.

Wherefore the judgments are each affirmed on the original and cross appeals.